162405 Charles Michael Bradley et al. v. David J. Sugarbaker, M.D. Mr. Bradley, good morning. Good morning, sir. May it please the court if I could reserve two minutes for rebuttal? Two minutes? Yes. Thank you. Your Honors, we have designated two issues on appeal. The first one being the admission into evidence of two documents. One, the diary prepared by co-plaintiff Harper Bradley. And the second document was a hospital record that essentially mirrored the pertinent part of the diary. Both documents in pertinent part stating that according to the interventional radiologist that was involved in the treatment in this case, a needle biopsy under the circumstances of the plaintiff who had a suspected mass otherwise known as a Pankos tumor could not be efficiently or even possibly examined by the use of a fine needle biopsy or core biopsy. The trial judge admitted the diary and admitted the record from the hospital. The trial judge used Rule Evidence 807 to admit the diary and she used the business record exception to admit the medical record. The brief examines in pretty much depth two problems in general that we feel that we're standing in the way of a proper exercise of 807. And that would be that the document, meaning the diary, had equivalent guarantees of trustworthiness. The diary itself was a remarkable document insofar as given that it was allegedly recording medical decisions, it was recording a medical decision that could be found nowhere in the medical record. The document is at the appendix 17 and the document being the diary only reflects what Barbara Bradley was told by a physician's assistant who in turn was allegedly told it by an interventional radiologist. There is a memo, I think I made a mistake, it's the memo of telephone calls that's at the addendum at 17 that accomplishes a few things. Given that the memo was supposed to memorialize medical decisions, in particular the viability of a needle biopsy, the memo says nothing about the viability of a needle biopsy. The memo only states that the person who was consulted to see if a needle biopsy could be done, who was the interventional radiologist, said she wanted to have another test performed. The first opportunity for memorializing what her actual opinion was, was in the information sent from the interventional radiologist to the physician's assistant, William Hung. There was no record of any refusal by the interventional radiologist. The second layer would have been a transfer of the information from William Hung to the patient, once again, only memorializes that the interventional radiologist wanted another PET CT to be performed. Could you focus for a minute on the question of what Hung was, Let's assume for a second that the diary should not have come in for the truth of the matter asserted of what the radiologist Jacobson said to Hung. If we assume that and then ask the question, so what difference did that make in the trial? As I understand it, your counsel affirmatively wanted to put into evidence precisely what was in the diary through the testimony of Mrs. Bradley saying what she'd been told by Hung, but only wanted to put it in to show why she then did what she did next. That's right. So the jury was going to, in any event, hear this, albeit with a limiting instruction. They also heard from Dr. Sugarbaker that he said that Jacobson had concluded the FNA was not viable, and then Jacobson didn't come in to testify. And Sugarbaker also said it's routine in our office that we don't document these things. We're all in one place, and she just tells me. I'm having trouble seeing what, as a practical matter, the difference is to the jurors between those two scenarios where all the evidence is exactly the same, except on one piece of the evidence there's a limiting instruction, whereas on the other, on that piece, there's not a limiting instruction, but the same point established by that is proven by other evidence. Well, the first point I would make is there's a certain amount of status that is provided by something actually being in writing, regardless of whether it's a diary or it's a medical record. Barbara Bradley testified for approximately 30 minutes before the decision was made to admit the diary, and during that time, in the context of her testimony as to why she did not keep an appointment with Hartford Hospital to have a needle biopsy, she stated, well, I was told, but no mention of anything being in a diary entry that was contemporaneously kept. Sure, but the jurors wouldn't hear her. If everything had gone the way your side wanted, the jurors were going to hear through Mrs. Bradley that Hung had told her that the radiologists had concluded it wasn't necessary, there wasn't an option, and that's why she called off the procedure. Actually, I think more accurately what the record would reflect is that she never actually testified that the ultimate source of the decision that a needle biopsy couldn't be performed was the interventional radiologist. The testimony was, I canceled my appointment because Bill Hung told me that they said whoever they were. The diary actually identified the interventional radiologist, the person who they indicated was the person who would have to make the decision. So she said she couldn't remember that detail. The diary could be used to refresh her memory or criticize her or cross-examine her. If she had done that, it might have been able to refresh her recollection, but it wouldn't change the fact that the status of it was hearsay. And so what you have here is the anomaly of the only indication in the hospital record is of a record of telephone calls, all of which suggest one thing and one thing only. Bill Hung went to the interventional radiologist to get the answer, and the question was, can a needle biopsy be done? And the response was, I want to do another test. What motivation would Hung have had to lie? Well, during the phone conversation with Mrs. Bradley. Okay, you've got a record of Dr. Sugarbaker clearly indicating that he wasn't any fan of needle biopsy. He indicated at one point in the trial testimony in the second trial that before he ever heard from anyone as to the viability of needle biopsy, he had already decided against it. The physician's assistant worked for Dr. Sugarbaker, and Dr. Sugarbaker clearly wasn't in favor of doing a needle biopsy. So what would be in it for Bill Hung? The inference would be Bill Hung did what he was told. He said what he was told to say, and what he said as the brief exhibits made no common sense whatsoever, according to the experts and everything else. Thank you. Mr. Wilkinson, good morning. Good morning. May it please the court, James Wilkinson on behalf of the defendant appellee David Sugarbaker. I want to pick up where Mr. Bradley just left off with respect to Dr. Sugarbaker's assessment of FNA and sending Ms. Bradley to interventional radiology for the assessment. It's true that Dr. Sugarbaker did not believe that FNA would provide the type of result that he was looking for. In other words, an FNA only extracts some cells, and those FNAs are notoriously unreliable. They can tell you if you have cancer. They can't tell you if you didn't have cancer. Nevertheless, he testified, and Ms. Bradley came in. She had already been to another thoracic surgeon in Hartford and had scheduled her for an FNA, and she was going to go in to see if they could do it there. They had a discussion of that during that first meeting, and Dr. Sugarbaker clearly put in his note, since the patient was asking about FNA, and that is an available alternative, whether or not he put it in his note, we'll see about an FNA. There is then a note in the medical records indicating that she was going to be worked up for an FNA. The evidence then indicates that the PET-CT scan, which is what the interventional radiologist utilizes in order to determine whether an FNA can be done safely and efficaciously, was then examined by Dr. Jacobson, and the evidence is that Dr. Jacobson came to the conclusion that an FNA could not be performed. Well, it's a little odd there's no medical record of that. Well, Your Honor, it's not odd. As I believe you pointed out, Your Honor, Dr. Sugarbaker testifies that that type of back and forth between the two disciplines of medicine, between the thoracic surgeon and the interventional radiologist, Jacobson looks at the materials, makes no record of it. Jacobson tells Sugarbaker, neither of them make any record of that conversation. Someone then talks to Hung. No one makes a record of that conversation. Hung then talks to the patient, and Hung makes no record of that conversation. That's not what you're used to seeing in medical records these days, is it? Well, there was testimony on that, both from Dr. Sugarbaker. There was testimony from that from Dr. Jacobson. It was in her deposition. And there was testimony from Dr. Jones, our expert witness from Sloan-Kettering Memorial, that this is frequently you talk about what tests you are going to do, not what tests you are not going to do. And in this case, an FNA was not performed. And it's advised to a patient not to do a diagnostic test. Pardon? The bottom line is, it is professional advice from a radiologist conveyed to a patient to forego doing a diagnostic test that another doctor had suggested the patient do. That's a pretty substantial thing, isn't it? Well, it may be a substantial thing, Your Honor. And nobody makes any record of it. Well, the record of it, Your Honor, is that it wasn't done. And Dr. Sugarbaker had a recollection of speaking with either Hung or Jacobson concerning the lack of feasibility of doing an FNA. Now, with respect, Your Honor, to the residual clause, and, Your Honor, the jury heard all of this testimony. All of these points were raised by Mr. Bradley at the trial. I would suggest, Your Honor, that this was properly admitted under the residual clause. The guarantee of trustworthiness, which is one of the provisions of the clause, I believe the circumstances of this case indicate that there would be guarantees of trustworthiness. As to what Jacobson said to Hung? Yes, Your Honor. And what is that guarantee? The circumstances of the case, Your Honor. We're at a point where a woman has come in and there's a concern that she might have a cancer. But since Jacobson is available to testify, how would you satisfy the residual clause being met? In other words, you have a classic case where direct, firsthand eyewitness testimony is available. Yes, Your Honor. And I'm not familiar with any case ever using the residual clause where that factor is present. Well, we're talking about what happened during the conversation. And under Rule 804A3, Dr. Jacobson, the plaintiffs put this in one of their pretrial motions, and she testified at her deposition that neither she nor Dr. Hung had any recollection of the conversation, and it's not surprising because it took place years before they were ever deposed. And a lack of recollection as to a conversation, which the plaintiffs stipulated she had, is unavailable under the... Well, is it? Because you still have the... didn't you still have the radiological scan screens available to be read? Yes, Your Honor. So she could read them and say, here's how I read them today, and there's no reason I would have read them differently four years ago. Well, she might say that, Your Honor. She might come in and say, I'll read them and... And you have to test that before you start using the residual clause? I don't believe you do, Your Honor, because we're talking about what was the conversation then, not what Dr. Jacobson's reading is going to be 16, 14, 12 years after the events took place. The plaintiffs were provided the opportunity to take a deposition of Dr. Jacobson, and they declined to do so immediately prior to the trial. So the issue was not, what is Dr. Jacobson's view of whether or not she could have performed an FNA now? The issue is, what was it then and what was communicated then? And I suggest, Your Honor, when they were told that the interventional radiologist indicated that she could not perform the FNA, then if there's a problem with that, that's not on Dr. Sugarbaker. If the interventional radiologist said you can't do an FNA and an FNA could, in fact, be done, then their case is not with Dr. Sugarbaker. Dr. Sugarbaker can't do FNAs. The only thing he can do with respect to that is to refer them to the discipline of medicine that does that, which is the interventional radiologist. I would submit, Your Honor, again, going along the lines of the circumstances that took place here, Ms. Bradley came in on the 7th. She was evaluated by Dr. Sugarbaker. They talked about doing an FNA. He put in his record that he would see about an FNA. Ms. Bradley then testified that they went out after seeing Dr. Sugarbaker and talked to Dr. Zelos. Dr. Zelos, again, he asked about FNA. He said they would have to have the interventional radiologist take a look at it and they would get back to them the following day. That took place, and the following day there was a call placed, and that's the essence of this conversation. I would also like to point out, Your Honor, with respect to the diary. The diary was only corroborative of testimony that was elicited by the plaintiff on direct examination during the course of trial. So they put the evidence in themselves without any restriction on the evidence as it went in. So that was brought up. At the first trial, this all came in with no objection. At the second trial, they tried to object to it, but the testimony was put in by them through Ms. Bradley. And another thing about the guarantee of trustworthiness, Your Honor, is this is in a setting where, again, it's akin to the statements made for medical diagnosis or treatment under 8034. This is a very serious situation and it's a binary choice. Can we do the FNA or can we not do the FNA? It's given to the interventional radiologist. The fact that there is no record of that, several witnesses testified, including Dr. Sugarbee, that's not normally the type of thing that we put in the record. Dr. Jacobson's deposition, which the plaintiffs put into their brief, indicates that's everything. Thank you. Thank you. Dr. Jacobson's deposition was taken and there wasn't anything tricky about it. She was asked point blank to look at the very film. It wasn't put up on a proper screen. Sorry to interrupt you, Your Honor. That proposition itself was stated by Attorney Wilkinson, who was not an interventional radiologist or any kind of radiologist himself. They also objected to her looking at it because it was the wrong film, something that Attorney Wilkinson admitted at a pretrial conference in front of the trial judge. The point being that an honest effort was made to have her look at the very source of information that if she had ever said that test, that needle biopsy couldn't have been done, that's what she would have relied on. We made a good faith effort to give it to her, whether it was on imperfect equipment or it wasn't, and that there's no saying what would have happened if she had been able to look at it and it would have jogged her mind. Likewise, the same process for the defendants who have the burden of proof to say that 807 applied, they could have called her a witness and used any equipment that they wanted to use and put that information in front of her and asked her themselves. And if it were true that based on the Hartford Hospital PET CT, she couldn't have done a needle biopsy, she could have said so. But that opportunity was deprived of anybody because the diary was admitted in lieu of her own testimony. We tried, we failed because of objections to her deposition testimony, which I would submit were a total violation of Rule 30. We weren't trying to harass her, we weren't doing anything to invade a privilege, they were fair questions and they were blocked. And they were blocked by the duo of Attorney Wilkinson and Attorney LaVoy who represented all the witnesses that were employees of Partners Healthcare. Thank you. Thank you.